UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VENESSA DOBNEY,

                    Plaintiff,

      v.

THE WALT DISNEY COMPANY, AMERICAN
BROADCASTING COMPANIES, INC.
ELIZABETH BARRETT, and RICHARD McHALE,

                    Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. 23-CV-2282

      Plaintiff, Venessa Dobney, by and through her undersigned counsel, Kalmanson Cohen, PLLC, alleges the following upon personal knowledge as to her own acts, and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

      1.    Defendant, The Walt Disney Company ("Disney"), the parent company of Defendant American Broadcasting Companies, Inc. ("ABC"), is a large, prolific media company. According to its website, Disney purports to be "committed to developing and retaining a diverse workforce [and] fostering a company culture that is welcoming and respectful…"

      2.    Contrary to Disney's public statements, Plaintiff, Venessa Dobney, a Black woman, worked for ten years in ABC News' Finance Department, where she endured sustained race-based discrimination, and then, retaliation for making protected complaints about those racial inequities.

      3.    Ultimately, ABC constructively discharged her.

      4.    Specifically, *inter alia*, Defendants denied Ms. Dobney managerial responsibilities commensurate with her title and equal to those of Caucasian counterparts, repeatedly passed her over for promotion in favor of less experienced non-Black employees, chronically underpaid her as compared to her Caucasian colleagues, and created a hostile work environment.

5. Despite her repeated complaints, through both formal and informal channels, the Company never remedied the harm that Ms. Dobney suffered.

6. Instead, when Ms. Dobney reported the Company's race-based discrimination, the Company embarked on a campaign of retaliation against her, assigning her a punishing amount of work that far exceeded that of any of her counterparts, refusing to give her opportunities for advancement within the Company, and then *penalizing* her for not having had the opportunities that they systematically denied her.

7. Consequently, on September 9, 2022, after ten (10) years of service, dedication, and hard work, the Company forced Ms. Dobney out of the Company as a result of its sustained intolerable, illegal, and debasing treatment that went unabated despite Ms. Dobney's repeated pleas for correction.

8. Defendants' conduct violates federal, state, and city law, as well as Defendants' own policies. Accordingly, Dobney brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*, and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*

## **JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) over Plaintiff's federal claims. This Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to 28 U.S.C. § 1367 as those claims are so related to the federal claims in this action such that they form part of the same case or controversy.

10. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

11. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the District in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

12. On or about August 4, 2022, and again through counsel on or about November 30 2022, Ms. Dobney filed a charge of discrimination with the United States Equal Employment

Opportunity Commission ("EEOC"), alleging that she had been discriminated and retaliated against on the basis of her race. The EEOC issued an administrative dismissal and a Right to Sue Notice on December 21, 2022.  Accordingly all administrative pre-requisites have been satisfied and this Complaint is timely filed.

## PARTIES

13. Plaintiff Venessa Dobney ("Dobney") is a Black woman residing in, and a citizen of, the state of New Jersey.  She was employed at Disney, via Defendant ABC, from September 2012 to September 2022 at which point she was constructively discharged.

14. Defendant Disney is incorporated in Delaware, headquartered in Burbank, California, and does business in New York State.

15. Defendant ABC, is incorporated in Delaware and does business in New York State.

16. ABC is a subsidiary of Defendant Disney.[1]

17. At all relevant times, Defendant Elizabeth Barrett ("Barrett") exercised dominion and control over the terms and conditions of Ms. Dobney's employment.  Defendant Barrett is currently the Vice President, Finance & Business Planning for Disney.  She previously served in other senior level positions, including Vice President of Finance, Business Planning and Strategy for ABC News.

18. Upon information and belief, Defendant Barrett is citizen of the state of New York.

19. At all relevant times, Defendant Richard McHale ("McHale") exercised dominion and control over the terms and conditions of Ms. Dobney's employment.  Defendant McHale is the Director of Financial Planning & Analysis - ABC News Broadcast, Digital & Longform Content · Disney General Entertainment.

20. Upon information and belief, Defendant McHale is a citizen of the state of New York.

## FACTUAL ALLEGATIONS

---

[1] Defendants Disney and ABC are collectively referred to as "the Company."  All the Defendants are collectively referred to as "Defendants".

21. In September 2012, Ms. Dobney began working in the Finance Department at ABC News as a Senior Financial Analyst.

22. Ms. Dobney, a graduate of Rutgers University with five years of financial experience before joining Disney, was excited about a position promising her growth within ABC, a prestigious company that appeared to prize her experience and potential.

23. However, her expectations were thwarted by the Company's racially discriminatory treatment and its retaliation when she made complaints about racial inequities at the Company.

## The Company's Discriminatory Conduct

24. In January 2016, Ms. Dobney was promoted in place to Manager.

25. Immediately Ms. Dobney questioned why she had been appointed to "Manager" but had not been assigned any direct reports.

26. The Company offered Ms. Dobney a variety of thin excuses. For example, she was told that there purportedly was no headcount for her to supervise, and that there was a hiring freeze.

27. None of these excuses could withstand scrutiny.

28. In contrast to Ms. Dobney, all non-Black managers in the Finance Department had direct reports.

29. In September 2018, Ms. Dobney again raised concerns to Defendant Barrett that she did not have any direct reports.

30. In that conversation, Ms. Dobney highlighted that she and two other women of color were the only "managers" in the Finance Department with a token title. Though Ms. Barrett acknowledged the need to address this disparity and gave lip service about being committed to doing so, the Company did not assign Ms. Dobney a direct report until 2019.

31. In 2019, the Company reorganized the Finance Department, and Ms. Dobney began reporting to Defendant McHale.

32. Almost immediately, McHale was openly hostile to Ms. Dobney. In an introductory meeting, before she even started working on his team, McHale shut the door on the possibility of any advancement, telling Dobney "There was not going to be movement anytime soon."

33. McHale was aggressive and verbally abusive to Ms. Dobney without reason or provocation, treating her differently from her Caucasian counterparts.

34. For example, he yelled, cursed, and belittled her. McHale refused to provide Ms. Dobney with an office commensurate with her title or with those of her non-Black counterparts.

35. In addition, McHale did not give Ms. Dobney the same responsibilities or opportunities as her non-Black colleagues, such as interviewing candidates for the team. He also criticized her more than non-Black counterparts though she was conscientious and her work was excellent.

36. As a result, Ms. Dobney again sought assistance from Ms. Barrett, and then from employee relations ("ER"). They did nothing.

37. Ms. Dobney was not alone in experiencing McHale's animus toward Black employees. Prior to and during the early months of the reorganization, the only two other Black employees left the Finance Department as a result of McHale's targeted mistreatment of them.

38. Despite these troubling red flags, Ms. Barrett did nothing, tacitly endorsing McHale's racist conduct by failing to stop it.

39. In 2019, Ms. Dobney was finally assigned one direct report–three years after having become a "Manager," at least in title. But the assignment was a sham. Ms. Dobney's direct report, an employee already with the Company, had a full portfolio of existing work - accounts payable, accounts receivable, and other work that was not within Ms. Dobney's workflow. Instead of providing support, the direct report added to Ms. Dobney's burgeoning workload.

40. In truth, the move only benefitted Ms. Barrett, making her look good to "show" she had a growing group of direct and indirect reports under her.

41. Ms. Dobney nonetheless took her role as manager seriously.

42. Ms. Dobney continued to mentor and train the employee.

43. By March 2020, Ms. Dobney was the only Black employee remaining in the Finance Department. Around that time, McHale cursed and yelled at her during a Zoom call, criticizing work that another manager had already approved. It was humiliating and traumatizing.

44. In April 2020, after Ms. Dobney made multiple reports to the Company about McHale's mistreatment, McHale begrudgingly and insincerely apologized to Ms. Dobney for his behavior.

**McHale Retaliates Against Ms. Dobney for Making Protected Complaints.**

45. It was then that McHale began to retaliate against Ms. Dobney for making protected complaints against him.

46. First, McHale tasked Ms. Dobney with participating in his campaign against people of color. Specifically, Mr. McHale instructed Ms. Dobney to manage out her direct report who was an employee of color. He directed her to "specifically find every mistake [she makes and], keep a record, so we can put her on a performance plan."

47. Ms. Dobney did not believe that her direct report had any performance issues requiring "management." Rather, McHale's instruction was unsupported and came on the heels of *that* employee's complaint to HR about unfair treatment and favoritism.

48. Ms. Dobney did not yield to McHale's efforts to silence her protected complaints. Between summer 2020 and spring 2021, Ms. Dobney was in routine contact with HR about the racial disparities within the Finance Department.

49. In March 2020, Ms. Dobney formalized her complaint with ER.

50. In August 2020, the Company validated Ms. Dobney's complaints, but its response was disingenuous, patronizing, and anemic.

51. Ms. Dobney was told that she was "lucky" to be in a department that wanted to "learn to do better" and that the Company was sending the leadership team to management training to rectify the situation.

52. Even these tepid promised improvements did not come to pass.

53. Instead, in spiteful retribution for her complaints about racial inequities, by late 2020, McHale had doubled Ms. Dobney's responsibilities with no additional staff.

54. In making these assignments, McHale was setting Ms. Dobney up to fail; Ms. Dobney was now doing the job of more than three people. It was neither manageable nor sustainable. Nevertheless, Ms. Dobney's performance was beyond reproach, and that assessment was reflected in her performance reviews.

55. During these months, the Company acknowledged that Ms. Dobney, who was pregnant at the time, had a workload that exceeded the capacity of one employee.

56. At this time, Ms. Dobney had a spiraling workload comprised of both junior analyst work and managerial level work with no reprieve and no support.

57. Despite this extraordinary plate of responsibilities, Ms. Dobney excelled at performing her job.

58. Still, the crushing, around-the-clock workload caused Ms. Dobney great anxiety and emotional distress, sending her into early labor. She delivered her baby several weeks early.

59. By early 2021, at least two of Ms. Dobney's non-Black counterparts confirmed that McHale was burdening Ms. Dobney with far more work than was being asked of them. Each of those individuals also had direct reports to whom to delegate junior level analyst tasks.

60. Accordingly, Ms. Dobney *again* brought her concerns to HR with documentation evidencing the unequal workloads.

61. McHale then berated Ms. Dobney about having reported to HR that she was being set up for failure, and stated that Ms. Dobney "makes it difficult for [the Company] to give her opportunities."

62. In or around September 2021, Ms. Dobney expressed her frustration to Ms. Barrett that despite her exceptional performance with an ever-growing workload, she had not been rewarded in any manner.

63. In that conversation, Ms. Dobney explicitly described feeling boxed in by Mr. McHale – her manager—who was retaliating against her for making protected complaints against him.

64. Ms. Dobney further informed Ms. Barrett that she wanted to be promoted to a Senior Manager position in recognition of her contributions.

65. In response, Ms. Barrett told Ms. Dobney that there was no headcount available to promote her, and that in any event, promotions in place did not happen.

66. The Company laid bare that its refusal to promote Ms. Dobney was racially-motivated and in retaliation for her expression of protected rights, when just one week later, it promoted in place Euris Peña—a male employee who had been with the Company for a little over a year into the exact role that Ms. Dobney had sought–Senior Manager.

67. The position had not been advertised and Ms. Dobney had not been given an opportunity to interview or apply for it.

68. Moreover, around the same time, Leah Auster, a Caucasian woman and another relatively short-term employee, was also promoted in place, to Director.

69. Neither Peña nor Auster had expansions to their workload nor Ms. Dobney's experience within the Company to justify their promotions ahead of Ms. Dobney. Rather—the commonalities between them were that they were not Black and had not voiced concerns about the Company's racial inequities.

70. In response, Ms. Dobney escalated her complaints to Executive Vice President, Derrick Medina who promised to inquire.

71. It was at this time, in late 2021, that Dobney went into premature labor and went out on maternity leave.

72. During her maternity leave, McHale purported to "invite" Ms. Dobney to interview for two Senior Manager roles that had become available.

73. But Ms. Dobney was an obvious choice for the Senior Manager for Digital role, and should not have had to "interview" for it.

74. Specifically, Ms. Dobney had hired and trained the team that the new Senior Manager for digital would oversee and who were going to be assigned a portion of the larded workflow for which Ms. Dobney had long been responsible. Ms. Dobney also had strong relationships with the business partners with whom that Senior Manager would work. Indeed, those business partners relied on the standardized reporting and metrics that Ms. Dobney had, herself, developed.

75. Nevertheless, she "applied" for the digital Senior Manager role, interviewing only with McHale, the very individual who had embarked on a campaign of discrimination and retaliation against her.

76. Ms. Dobney did not get the job. The blow to her confidence and self-esteem was crushing.

77. Instead, the Company appointed Eric Levine to the Senior Manager role. Mr. Levine was a Caucasian male without the requisite experience for the position.

78. Ms. Dobney sought clarity from Ms. Barrett who touted Mr. Levine's experience (which was false) and also cited amorphous "performance issues" as the patently pretextual basis

for the denial of this promotion.[2] In a moment of candor, Mr. Levine shared with Ms. Dobney that the Senior Manager for Digital role was quite different from the majority of his experience.

79. Ms. Barrett could not describe any specific performance deficiencies, and in fact, Ms. Dobney had never received anything but positive feedback and reviews, both oral and written.

80. Then, adding insult to injury, McHale offered Ms. Dobney another so called "opportunity"—namely, that she could *interview* for a *lateral* Manager role that would be reporting into the Senior Manager role that she had just been denied.

81. No other person reporting to McHale had ever been made to "interview" for a lateral role.

82. The process for selection for the Senior Manager and Manager positions were patently discriminatory and retaliatory.

### Ms. Dobney Was Paid Less than her Non-Black Counterparts

83. Despite Ms. Dobney's excellent work, expansive workload, and many contributions to the Company, the Company still chronically underpaid her.

84. Upon information and belief, Dobney was compensated less than her non-Black counterparts from 2012, when she first started with the Company and throughout the years that followed.

85. Had Ms. Dobney been properly advanced throughout her tenure with the Company, she would have enjoyed higher earning potential, bonuses and other benefits.

86. When New York City's Salary Transparency Law went into effect in 2022, this suspicion was essentially confirmed.

87. Ms. Dobney returned from leave in August 2022, with false attacks on her performance being made and no path to promotion in sight. She was forced to continue to do the work of the Senior Manager (the role of which she was denied) while Mr. Levine transitioned and learned how to perform the role, and was stuck working for the same leadership that had already branded her as a problem and engaged in relentless discrimination and retaliation.

---

[2] Ms. Barrett also smeared Ms. Dobney to Mr. Medina, baselessly portraying her as an underperformer. While Mr. Medina shared that information with Ms. Dobney, along with a promise to report Ms. Barrett's mistreatment, the damage to Ms. Dobney's reputation had already been done.

88. Forced out because of the intolerable conditions taking a toll on her physical and mental health, Ms. Dobney was constructively discharged in September 2022.

89. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all issues so triable.

## FIRST CAUSE OF ACTION

### Discrimination in Violation of Title VII

90. Dobney repeats and realleges each allegation as set forth above.

91. Defendants unlawfully discriminated against Dobney in the terms and conditions of her employment by subjecting her to disparate treatment, adverse actions, and constructive discharge on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e(1)-(17) ("Title VII").

92. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

93. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's federally protected rights.

94. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SECOND CAUSE OF ACTION:

### Retaliation in Violation of Title VII

95. Dobney repeats and realleges each allegation set forth above.

96. Defendants unlawfully retaliated against Dobney for her protected complaints of discrimination in violation of Title VII, 42 U.S.C. § 2000e-3(a).

97. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

98. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's federally protected rights.

99. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## THIRD CAUSE OF ACTION:

### Discrimination in Violation of § 1981

100. Dobney repeats and realleges each allegation set forth above.

101. Defendants unlawfully discriminated against Dobney in the terms and conditions of her employment by subjecting her to disparate treatment and adverse actions including constructive discharge on the basis of race in violation of 42 U.S.C. § 1981.

102. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

103. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's federally protected rights.

104. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of § 1981

105. Dobney repeats and realleges each allegation set forth above.

106. Defendants unlawfully retaliated against Dobney for her protected discrimination complaints in retaliation for her protected activities, in violation of § 1981.

107. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

108. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's federally protected rights.

109. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL

110. Dobney repeats and realleges each allegation set forth above.

111. Defendants unlawfully discriminated against Dobney in the terms and conditions of her employment by subjecting her to disparate treatment and adverse actions including constructive discharge, on the basis of her race, in violation of the New York State Human Rights Law, N.Y. Exec Law § 296(1) ("NYSHRL").

112. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

113. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

114. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SIXTH CAUSE OF ACTION:
### Retaliation in Violation of the NYSHRL

115. Dobney repeats and realleges each allegation set forth above.

116. Defendants retaliated against Dobney for her protected discrimination complaints in violation of the NYSHRL, N.Y. Exec Law § 296(7).

117. The retaliatory actions to which Dobney was subjected could have dissuaded reasonable employees in her position from complaining of discrimination.

118. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

119. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

120. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and cost.

## SEVENTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL

121. Dobney repeats and realleges each allegation set forth above.

122. Defendants unlawfully discriminated against Dobney in the terms and conditions of their employment by subjecting her to disparate treatment and adverse actions including constructive discharge, on the basis of her race, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) ("NYCHRL").

123. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

124. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

125. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## EIGHTH CAUSE OF ACTION:

### Retaliation in Violation of the NYCHRL

126. Dobney repeats and realleges each allegation set forth above.

127. Defendants retaliated against Dobney for her protected discrimination complaints in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(7).

128. The retaliatory actions to which Dobney was subjected could have dissuaded reasonable employees in her position from complaining of discrimination.

129. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

130. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

131. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff prays that the Court enter judgment and relief as follows:

a. Declaring that the acts and omissions complained of herein are unlawful and violate Title VII, § 1981, the NYSHRL, and the NYCHRL;

b. Awarding damages to Plaintiff, in an amount to be determined at trial, for lost opportunities and for failure to compensate her properly, and to otherwise make Plaintiff whole for any losses suffered as a result of Defendants' actions;

c. Awarding Plaintiff compensatory damages, in an amount to be determined at trial for humiliation, mental anguish, and emotional distress;

d. Awarding Plaintiff punitive damages in an amount to be determined at trial;

e. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action; and

f.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' actions.

Dated: New York, New York
March 16, 2023

                                                /s/ Randi M. Cohen
Randi M. Cohen (RC4448)
Marla Tepper (MT7529)

Kalmanson Cohen PLLC
165 Broadway, 23rd Floor
New York, NY 10006
T: (646) 759 3655 | F: 646 513 2936
Randi@kalmansoncohen.com
marla@kalmansoncohen.com
http://www.kalmansoncohen.com
*Attorneys for Plaintiff, Venessa Dobney*